UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN K. BOLDE, individually and as Personal Representative of the Estate of SOPHIE KOWALCZYK, Deceased; JASON NOVAK, as Personal Representative of the Estate of EDWARD R. NOVAK, Deceased; KATHLEEN NOVAK, as Personal Representative of the Estate of FRANK A. NOVAK, Deceased; ARDEN DILLARD, as Personal Representative of the Estate of ADRIENNE A. BARANOWSKI, Deceased; EDWARD J. KOWALCZYK, individually; and JOHN A. KOWALCZYK, individually.<br><br>                      Plaintiffs,<br>    v.<br><br>THE ISLAMIC REPUBLIC OF IRAN<br>Ministry of Foreign Affairs<br>Khomeini Avenue<br>United Nations Street<br>Tehran, Iran,<br><br>                      Defendant. | CASE NO. **1:26-cv-00714** |

**COMPLAINT FOR DAMAGES FOR STATE-SPONSORED TERRORISM
UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT**

**INTRODUCTION**

1. This action is based on the hijacking of TransWorld Airlines Flight 847 ("TWA 847") after departing from Athens, Greece on June 14, 1985. Plaintiffs seek money damages from the Islamic Republic of Iran ("Iran") as compensation for severe pain and suffering caused by Iran's provision of material support and resources to the hijackers for certain acts of terrorism, including aircraft sabotage, hostage taking, and torture, as well as the underlying torts of assault, battery, solatium, false imprisonment, and intentional infliction of emotional distress.

2. Plaintiffs bring this action pursuant to the antiterrorism provision of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. ("FSIA"), which affords U.S. victims of state-

1

sponsored terrorism a private right of action against the foreign state responsible for a terrorist act. Foreign states are held liable when they provide material support or resources for acts of terrorism.

## PARTIES

3. Each Plaintiff qualifies as a proper "claimant" under 28 U.S.C. §§ 1605A(a)(2)(A)(ii) and 1605A(c)(1) and (4). Each was a U.S. citizen within the meaning of 8 U.S.C. § 1101(a)(22) at the time of the hijacking and remains a U.S. citizen.

4. Plaintiff Susan Bolde ("Susan") is the legal representative for the Estate of Sophie Kowalcyk. Plaintiff Jason Novak is the legal representative for the Estate of Edward R. Novak. Sophie Kowalczyk ("Sophie") and Edward R. Novak ("Edward R") were sibling passengers aboard TWA 847 at the time of the hijacking. Eward R's estate was a plaintiff in a prior action brought against Iran for its material support of the hijackers in this Court, *Allan, et al. v. Iran*, Case No. 1:17-cv-00338-RJL ("*Allan*"), related to his and his wife's experience as hijacked passengers. However, his estate did not bring a solatium claim related to his suffering on account of his sister Sophie's experience as a hijacked passenger. Neither Sophie nor her estate was a plaintiff in any prior action against Defendant.

5. Plaintiff Arden Dilliard is the legal representative of the Estate of Adrienne A. Baranowski. Adrienne Baranowski ("Adrienne") is Sophie's child. The Estate of Adrienne A. Baranowski was not a plaintiff in any prior action.

6. Plaintiff Kathleen Novak is the legal representative of the Estate of Frank A. Novak. Frank A. Novak ("Frank") is the deceased brother of Sophie and Edward R. His estate is suing on account of his suffering related to both of his siblings being hijacked passengers on TWA 847.

7. Susan, along with her brothers, Plaintiffs Edward J. Kowalczyk ("Edward J") and John A. Kowalczyk ("John"), is suing in her individual capacity. Susan, Edward J., and John are the living children of Delores Kowalczyk ("Delores"), who was a hijacked passenger on TWA 847 and a

2

successful Plaintiff in *Allan*. They are suing Defendant in connection with their suffering resulting from their mother being hijacked. Neither of them was a plaintiff in prior actions against Iran.

8. Iran is a foreign sovereign and a foreign state within the meaning of FSIA § 1603(a). This Court has already found that Iran provided material support to the TWA 847 hijackers, as defined by 18 U.S.C. § 2339A, in the form of expert advice and assistance, significant financial support and resources, training, facilities, weapons, personnel, and logistical aid. *See Allan*, 2019 WL 2185037, at *4 (D.D.C. May 21, 2019) ("Having considered the record evidence in this case, I find, consistent with Judge Jackson's opinion in *Stethem*, that Iran provided 'material support' to terrorist groups Hezbollah and Amal sufficient to meet the requirements of § 1605A(a)(1).") and *Estate of John McCarty, et al. v. Iran*, Case No. 1:19-cv-00853-RJL, 2020 WL 7696062, at *4 (D.D.C. Dec. 28, 2020) (same). This includes material support to Hezbollah terrorists who hijacked the aircraft and to their Amal terrorist reinforcements (collectively, the "terrorists") for the terrorist acts described herein. *Allan*, 2019 WL 2185037, at *4; *McCarty*, 2020 WL 7696062, at *4.

## JURISDICTION AND VENUE

9. Jurisdiction in this action is based on 28 U.S.C. § 1330(a), which provides: "The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement."

10. Iran is not immune from the court's jurisdiction in this action based on FSIA § 1605A(a)(1), the "terrorism exception" to foreign sovereign immunity. Section 1605A(a)(1) provides in relevant part, that a foreign state "shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which money damages are sought against a foreign state for personal injury

or death that was caused by an act of torture . . . aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."

11. Iran is subject to personal jurisdiction by virtue of 28 U.S.C. § 1330(b), which provides: "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title."

12. Venue is proper in this Court under 28 U.S.C. § 1391(f)(4), which provides in pertinent part that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

## TERRORISM-EXCEPTION JURISDICTIONAL FACTS

13. Plaintiffs bring this action pursuant to 28 U.S.C. § 1605A(c), which affords Plaintiffs a private right of action against Iran as a state sponsor of terrorism that provided material support and resources to the terrorists and captors referenced above. 28 U.S.C. § 1605A(c) provides, in relevant part, that a "foreign state that is . . . a state sponsor of terrorism as described in subsection (a)(2)(A)(i) . . . shall be liable to . . . a national of the United States . . . for personal injury or death caused by acts described in subsection (a)(1) of that foreign state . . . for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering . . . ." The acts described in 28 U.S.C. § 1605A(a)(1) include "the provision of material support or resources" for acts of "torture . . . aircraft sabotage [or] hostage taking."

14. Since January 23, 1984, Defendant Iran has been designated a state sponsor of terrorism by the U.S. Secretary of State pursuant to, inter alia, Section 6(j) of the Export Administration Act of 1979 – 50 U.S.C. Appendix § 2405(j).

4

15. As defined by Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, the hijackers of TWA 847 committed aircraft sabotage by (i) committing acts of violence against Sophie, Edward R, and Delores while they were passengers on board an aircraft in flight which endangered their safety on that aircraft and (ii) placing grenades and other explosives on board the aircraft.

16. As defined by Article 1 of the International Convention Against the Taking of Hostages, the hijackers of TWA 847 committed hostage-taking where they detained Sophie, Edward R, and Delores for varying periods of time up to three days for these hostages.

17. The hijackers additionally threatened Sophie, Edward R, and Delores with guns, knives and grenades; pushed and hit them; denigrated their religions, ethnicities, nationalities, and country of residence – the United States; deprived them of sleep and food; robbed them of their belongings, including invaluable jewelry such as wedding and engagement rings; forced them to remain in extremely painful positions for long periods of time; repeatedly pointed unloaded or partially loaded weapons at passengers and pulled the trigger (i.e. "Russian roulette"); screamed accusations at passengers that they were members of U.S. intelligence agencies and would be killed; paraded hostages in front of the media at gunpoint; conducted a mock execution in which hostages were lined up against a wall in Beirut by guards with guns; forced hostages to watch propaganda films containing footage of atrocities; used hostages as bargaining chips in a geo-political conflict; and even murdered one passenger (not a plaintiff in this action) and threw him from the aircraft onto the tarmac at the airport in Beirut.

18. As defined by Section 3 of the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350, the hijackers of TWA 847 committed torture by intentionally inflicting physical and psychological injuries upon Sophie, Edward R, and Delores for the purpose of intimidating and

coercing them, as well as third parties, into compliance with their demands. These acts also harmed the family members of these passengers.

19. The Estate of Sophie Kowalczyk seeks a judgment from this Court holding Iran legally responsible for these heinous acts of terrorism, aircraft sabotage, hostage taking, and torture, and awarding her money damages for the acts of assault, battery, false imprisonment, and intentional infliction of emotional distress committed, as well as for solatium. All other Plaintiffs seek to hold Iran legally responsible for their personal suffering under a solatium theory for the violence done to their familial loved ones.

## FACTS REGARDING PLAINTIFFS' INJURIES

20. On June 14, 1985, TWA 847 departed from Athens, Greece, bound for Rome, Italy, carrying eight crew members and 143 passengers, including Sophie Kowalczyk, Edward R. Novak, and Delores Kowalcyzk.

21. Shortly after takeoff, two terrorist hijackers armed with hand grenades took control of the plane at gunpoint. The individuals were later identified as Mohammed Ali Hamadi ("Hamadi") and Hassan Izz al-Din ("Izz al-Din"). A third hijacker, Ali Atwa ("Atwa"), joined Hamadi and Izz al-Din on the plane the next day. All three men (collectively, the "hijackers") were members of Hezbollah, a designated terrorist organization, and were indicted by this Court for hijacking TWA 847. *United States v. Ali Atwa, et al.*, 1:85-cr-00405-1 (D.D.C. Nov. 14, 1985).

22. The hijackers ordered the plane to fly to Algeria or Iran. The flight crew convinced the hijackers that the plane lacked enough fuel, prompting the hijackers to order a diversion to Beirut, Lebanon for refueling. The hijackers pistol-whipped and otherwise physically and psychologically abused the cabin crew members, including holding a gun to the head of the pilot, Captain John Testrake, to force their compliance.

6

23. The hijackers ordered the passengers to put their hands on their heads and bend forward so that their heads were below the tops of the seats in front of them. This "TWA position," when held for hours at a time, proved torturously painful for the passengers. Passengers who failed to maintain the position even for a moment were struck violently. During the flight to Beirut, the hijackers screamed at, intimidated, terrorized, assaulted, and battered the Plaintiffs – treatment that continued throughout their ordeal.

24. After landing in Beirut, the hijackers began to beat two passengers, neither of whom are plaintiffs in this case, to force the Beirut airport personnel into providing fuel for the plane. The sounds of the violent beatings caused extreme fear and distress. At this point, the hijackers issued demands for the release of nearly eight hundred prisoners in Israel and Kuwait in exchange for the release of the TWA 847 hostages.

25. The hijackers then instructed Captain Testrake to fly to Algiers, Algeria. On the ground in Algiers, the hijackers repeatedly threatened to execute an American passenger every five minutes unless their demands were met, including a demand for more fuel.

26. The hijackers raised the level of fear and intimidation by prohibiting maintenance personnel from boarding the aircraft in Algiers and again ordered the plane back to Beirut. As the airplane approached Beirut for the second time, the Beirut airport authorities placed obstacles on the runway and turned off all the lights to dissuade the hijackers from landing. The hijackers insisted that the plane land regardless of the obstacles, even if it resulted in a crash. The flight crew announced to the passengers that they should brace for a crash landing in the dark. Panic and extreme fear spread throughout the plane. As the aircraft approached the runway, the obstacles were removed at the last minute.

27. On the ground in Beirut for the second time, the hijackers demanded that

7

reinforcements from Amal, a Lebanese military group affiliated with Hezbollah, be allowed to board the plane. When their demands were not met, they executed one passenger, Robert Stethem, who is not a plaintiff in this action, by gunshot to the head and shoved his body from the plane onto the tarmac. Shortly after Mr. Stethem's body was cruelly pushed from the plane, one of the hijackers shouted numbers to indicate the order in which passengers would be next to be executed, causing extreme terror and distress to those passengers. Soon thereafter, approximately ten reinforcements from Amal dressed in military uniforms boarded the plane, further heightening the passengers' fear anguish.

28. The hijackers then ordered Captain Testrake to fly the plane back to Algeria, and finally back again to Beirut. TWA 847 ended its ordeal, landing in Beirut on June 16, 1985. During the nearly 72-hour-long experience on board the aircraft, many passengers were brutally and repeatedly assaulted by their captors. The ordeal involved numerous acts of assault, battery, threats, excruciating pain (including from being forced to maintain the TWA position), and overwhelming terror in anticipation of either an imminent violent death or extended captivity.

29. As the aircraft crisscrossed between Algiers and Beirut, the immediate family members of the passengers suffered greatly from the uncertainty of what would happen to their loved ones—and from knowing that they were, at the very least, being brutalized and held hostage. Through detailed media coverage of the event, family members saw the hijackers pointing weapons at Captain Testrake. When news broke in the United States about the hijacking, audio of the plane's crew pleading with airport staff in Beirut that "they are beating the passengers" and "they are threatening to kill the passengers" was widely broadcast by major news outlets. Family members spent many excruciating days waiting and hoping to hear that their loved ones had been murdered.

30. During the ordeal and afterwards, many of the passengers and their family members

were also harassed by unrelenting members of the press, who invaded their privacy, exposed private details of their lives to a national audience, and caused them to feel humiliated and afraid.

31. Passengers and their family members, including Plaintiffs in this case, experienced, and many continue to experience, severe emotional, psychological and/or physiological impacts and symptoms, fear, anxiety, panic, humiliation, irritability, insomnia, nightmares, survivor's guilt, depression, hopelessness, paranoia, and other adverse symptoms.

### IRAN PROVIDED MATERIAL SUPPORT TO THE TERRORIST-HIJACKERS

32. In *McCarty*, this Court awarded damages to 37 plaintiffs who were both passengers and family members. *See* 2020 WL 7696062, at *6–7. In *Allan*, this Court awarded damages to 108 plaintiffs, all of whom were passengers and crew of TWA 847 and their family members. *See* 2019 WL 2185037, at *6–7. In *Stethem v. Islamic Republic of Iran*, this Court awarded damages to the estate and immediate family members of Robert Stethem, as well as six additional passengers (five Navy divers and one Army Reserve Major) and their spouses who were not aboard the plane. *See* 201 F. Supp. 2d 78, 85 (D.D.C. 2002). Iran has also been held liable for the terrorist hijacking of Kuwait Airways Flight 221, only a few months before the hijacking of TWA 847, involving substantially similar tactics and planning carried out with Iran's support. *Kapar v. Islamic Republic of Iran*, No., 2004 U.S. Dist. LEXIS 29416 at *1-3 (D.D.C. 2004) (The "methods" of the "Iranian-sponsored Hezbollah terrorists" who hijacked Kuwait Airways Flight 221 "were replicated in Hezbollah's hijacking of TWA flight # 847 in June 1985").

33. In *Allan* and *McCarty*, this Court held that Iran "provided 'material support' to terrorist groups Hezbollah and Amal" for the hijacking of TWA 847. *McCarty*, 2020 WL 7696062, at *3; *Allan*, 2019 WL 2185037, at *4. In support of that finding, this Court examined and took judicial notice of the evidentiary record in *Stethem*, as well as the updated evidence (including an updated expert report

by Patrick Clawson). *McCarty*, 2020 WL 7696062, at \*2–3, 4 (quoting *Stethem*, 201 F. Supp. 2d at 87); *Allan*, 2019 WL 2185037, at \*2–3, 4 (same). The *Allan, McCarty,* and *Stethem* courts reached the conclusion that "the evidence conclusively establishes that the Islamic Republic of Iran and its MOIS provided 'material support or resources' to Hizballah, and Hizballah and its co-conspirator Amal were the perpetrators of these heinous acts of terrorism." *Stethem*, 201 F. Supp. 2d at 87; *McCarty*, 2020 WL 7696062, at \*4; *Allan*, 2019 WL 2185037, at \*4.

34. Due to Iran's material support of the hijackers that caused the injuries to the Plaintiffs in this case, the Estate of Sophie Kowalczyk seeks a judgment from this Court (1) holding Defendant liable for the personal injuries she suffered as a result of torture and abuse, including acts of assault, battery, false imprisonment, and intentional infliction of emotional distress, and (2) awarding her pain and suffering damages for those acts.

35. Sophie's estate, along the Estate of Edward R. Novak, the Estate of Frank A. Novak, the Estate of Adrienne A. Baranowski, Edward J. Kowalczyk, and John A. Kowalczyk, also seeks a judgment from this Court (1) holding Defendant liable for the loss of solatium and intentional infliction of emotional distress that resulted from the hostage taking and torture of their passenger family members, and (2) awarding them solatium and/or pain and suffering damages.

### CLAIMS FOR RELIEF

**COUNT I – ACTION FOR HOSTAGE TAKING AND TORTURE
ON BEHALF OF THE ESTATE OF SOPHIE KOWALCYK**

36. Plaintiffs repeat, reallege, and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

37. Defendant is liable to each Sophie's estate under FSIA § 1605A(c) for "hostage taking." FSIA § 1605A(h)(2) defines "hostage taking" as having "the meaning given that term in Article

1 of the International Convention Against the Taking of Hostages ("Hostage-Taking Convention")." U.N. General Assembly, *International Convention against the Taking of Hostages*, 17 November 1979, No. 21931, available at: https://www.refworld.org/docid/3ae6b3ad4.html (last accessed January 24, 2026). Article 1 of the Hostage-Taking Convention defines a person who has committed the offence of "taking a hostage" as "any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage."

38. The Defendant, through Hezbollah and Amal, detained Sophie, along with other hostage passengers, and repeatedly threatened to injure, kill, or continue to detain them to coerce the U.S. Government to comply with their demands. Indeed, Iran was designated a state sponsor of terrorism on January 19, 1984, and remained a designated state sponsor of Hezbollah at the time of the hijacking. *See* Notice re Determination Pursuant to Section 6(i) of the Export Administration Act of 1979 – Iran, 49 Fed. Reg. 2836 (January 23, 1984).

39. Defendant is liable to Sophie under FSIA § 1605A(c) for "torture." FSIA § 1605A(h)(7) defines "torture" as having "the meaning given those terms in Section 3 of the Torture Victim Protection Act of 1991," 28 U.S.C. § 1350 ("TVPA"). Section 3 of the TVPA defines "torture" as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on

11

discrimination of any kind."

40. Defendant, through Hezbollah and Amal, committed such acts of torture against Sophie by inflicting physical and psychological injuries and pain and suffering on her while she was a passenger on TWA 847. Defendant committed those acts for the purpose of intimidating and punishing her for being American.

41. As a direct and proximate result of Defendant's material support of the actions of Hezbollah and Amal, Sophie endured pain and suffering for at least nine hours during her captivity and for years and decades thereafter.

42. The Estate of Sophie Kowalczyk, therefore, seeks compensatory damages for her severe and lasting physical injuries, psychological harm, extreme pain and suffering, and mental anguish, in a baseline amount of $1 million – the same amount awarded to similarly-affected Group 1 Plaint Hostage plaintiffs in *Allan* and *McCarty*.

### COUNT II – ACTION FOR ASSAULT AND BATTERY
### ON BEHALF OF THE ESTATE OF SOPHIE KOWALCYK

43. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

44. Defendant is liable to the Estate of Sophie Kowalczyk for assault and battery under FSIA § 1605A(c), and state common law as described in the Restatement (Second) of Torts §§ 21(assault), 13 (battery, harmful contact), and 18 (battery, offensive contact).

45. Defendant's agents, Hezbollah and Amal, acted with the intention to cause harmful or offensive contact with Sophie, or imminent apprehension of harmful or offensive contact, and did cause such contact when they shoved and hit Sophie and caused her to sit for hours with her head between her knees in excruciating pain.

12

46. As a direct and proximate result of the actions of Defendant's agents alleged herein, and Defendant's material support of the actions of its agents, Sophie sustained severe and lasting physical injuries, psychological harm, extreme pain and suffering, and mental anguish during her captivity and for years and decades thereafter.

47. The Estate of Sophie Kowalczyk, therefore, seeks compensatory damages for her severe and lasting physical injuries, psychological harm, extreme pain and suffering, and mental anguish, in a baseline amount of $1 million – the same amount awarded to similarly-affected Group 1 Plaint Hostage plaintiffs in *Allan* and *McCarty*.

**COUNT III – ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ON BEHALF OF THE ESTATE OF SOPHIE KOWALCZYK**

48. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

49. Defendant is liable to Sophie, under FSIA § 1605A(c) and state common law, as described in the Restatement (Second) of Torts § 46(1), for intentional infliction of emotional distress.

50. Defendant's conduct alleged herein, through Hezbollah and Amal, was extreme and outrageous, and it intentionally or recklessly caused severe emotional distress to Sophie.

51. As a direct and proximate result of the actions of Defendant's proxies alleged herein and Defendant's material support of those actions, Sophie endured pain and suffering during her captivity and for years and decades thereafter.

52. The Estate of Sophie Kowalczyk, therefore, seeks compensatory damages for her severe and lasting physical injuries, psychological harm, extreme pain and suffering, and mental anguish, in a baseline amount of $1 million – the same amount awarded to similarly-affected Group 1 Plaint Hostage plaintiffs in *Allan* and *McCarty*.

**COUNT IV – ACTION FOR FALSE IMPRISONMENT
ON BEHALF OF THE ESTATE OF SOPHIE KOWALCZYK**

53. Plaintiffs repeat, reallege, and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

54. Defendant is liable to Sophie under state common law, as described in the Restatement (Second) of Torts § 35, for false imprisonment.

55. Defendant, through Hezbollah and Amal, hijacked TWA 847, forced each and forced each passenger, including Sophie, to remain on the plane for several hours, and some for days, while it sat on the tarmac and travelled to other countries against their will. For Sophie, Defendant's conduct resulted in her false imprisonment for approximately nine hours.

56. As a direct and proximate result of Defendant's actions alleged herein and Defendant's material support of the actions of its proxies, Sophie endured pain and suffering during her captivity and for years and decades thereafter.

57. The Estate of Sophie Kowalczyk, therefore, seeks compensatory damages for her severe and lasting physical injuries, psychological harm, extreme pain and suffering, and mental anguish, in a baseline amount of $1 million – the same amount awarded to similarly-affected Group 1 Plaint Hostage plaintiffs in *Allan* and *McCarty*.

**COUNT V – ACTION FOR SOLATIUM AND INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS ON BEHALF OF ALL PLAINTIFFS**

58. Plaintiffs repeat, reallege, and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

59. Defendant is liable to all Plaintiffs for "loss of solatium" under FSIA § 1605A(c) and state common law as described in the Restatement (Second) of Torts § 46(2)(a). Under the FSIA, a "solatium claim is indistinguishable from an IIED claim" and is therefore analyzed by applying the

14

standards for intentional infliction of emotional distress ("IIED").[1]

60. Defendant, through Hezbollah and Amal, intentionally or recklessly caused severe emotional distress to each Plaintiff at the time of TWA 847, its crew and its passengers. Defendant's proxies; extreme and outrageous abuse and mistreatment of all crew and passengers was intended, or may be deemed to have been intended, to cause severe emotional harm to each Plaintiff who is a family member of the plane passengers. Moreover, Defendant's hostage taking and torture of the passengers are by their very definition extreme and outrageous and are intended by terrorists to cause the highest degree of emotional distress in their victims, including immediate family members of victims.

61. As a direct and proximate result of the actions of Defendant's proxies alleged herein and Defendant's material support of those actions, each Plaintiff endured pain and suffering during their family-member passenger's captivity and for years and decades thereafter.

62. All Plaintiffs therefore seek compensatory damages for the emotional injuries they suffered, in baseline amounts for families of Groups I and II passengers: Group I, $ 495,000 for children and $ 330,000 for siblings; Group II, $ 990,000 for children, and $ 660,000 for siblings — the same amounts awarded to similarly-affected family member plaintiffs in *Allan* and *McCarty*.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for the following relief:

63. A speedy and final resolution of the claims of these victims of state-sponsored terrorism;

---

[1] Under the FSIA, a 'solatium claim is indistinguishable from an IIED claim.'" Worley v. Islamic Republic of Iran, 75 F. Supp. 3d 311, 336 (D.D.C. 2014) (Lamberth, J.) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 79 (D.D.C. 2010) (Lamberth, J.)).

64. A Judgment holding Defendant liable for the acts complained of herein; and

65. A Judgment against Defendant for money damages to compensate Plaintiffs for their severe and lasting physical injuries, psychological harm, and extreme mental anguish, including but not limited to pain and suffering and solatium damages, in an amount to be determined based on evidence to be adduced in accordance with a schedule to be set by the Court and in accordance with the relief granted in *Allan* and *McCarty*.

DATED: February 28, 2026                Respectfully submitted,

**TIANA A. BEY, PC**

<u>/s/ Tiana A. Bey</u>
Tiana A. Bey (D.C. Bar No. 1013476)
16501 Shady Grove Road
PO Box 8207
Gaithersburg, MD 20898

*Attorney for Plaintiffs*